# EXHIBIT 1

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                          WACO DIVISION

 3   WSOU INVESTMENTS LLC          *   August 16, 2021
                                   *
 4   VS.                           *   CIVIL ACTION NOS.
                                   *
 5   CANON, INC.                   *   W-20-CV-980, 981, 982
     NXP USA, INC.
 6
                  BEFORE THE HONORABLE ALAN D ALBRIGHT
 7                    MOTION HEARING (via Zoom)

 8   APPEARANCES:

 9   For the Plaintiff:       Jonathan K. Waldrop, Esq.
                              John W. Downing, Esq.
10                            Heather S. Kim, Esq.
                              Kasowitz Benson Torres, LLP
11                            333 Twin Dolphin Drive, Suite 200
                              Redwood Shores, CA 94065
12
                              Mark D. Siegmund, Esq.
13                            Law Firm of Walt Fair, PLLC
                              1508 N. Valley Mills Drive
14                            Waco, TX 76710

15   For Defendant Canon:     Richard F. Martinelli, Esq.
                              Orrick Herrington & Sutcliffe LLP
16                            51 West 52nd Street
                              New York, NY 10019
17
                              John M. Jackson, Esq.
18                            Jackson Walker LLP
                              2323 Ross Ave., Ste 600
19                            Dallas, TX 75201

20   For Defendant NXP:       Adam Troy Schramek, Esq.
                              Eric Conley Green, Esq.
21                            Norton Rose Fulbright US LLP
                              98 San Jacinto Boulevard, Suite 1100
22                            Austin, TX 78701-4255

23                            Richard S. Zembek, Esq.
                              Fulbright & Jaworski, L.L.P.
24                            1301 McKinney, Suite 5100
                              Houston, TX 77010
25
```

2

1   Court Reporter:              Kristie M. Davis, CRR, RMR
                                PO Box 20994
2                               Waco, Texas 76702-0994
                                (254) 340-6114
3

4        Proceedings recorded by mechanical stenography, transcript

5   produced by computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (August 16, 2021, 1:00 p.m.)

2      DEPUTY CLERK:  Motion hearing in Civil Action W-20-CV-980,

3  styled WSOU Investments LLC versus Canon, Incorporated, NXP

4  USA, Incorporated and others.

5      THE COURT:  If I could have announcements from counsel,

6  please.

7      MR. SIEGMUND:  Good afternoon, Your Honor.  This is Mark

8  Siegmund for plaintiff WSOU Investments LLC.  I'm accompanied

9  by my colleagues Mr. Jon Waldrop, John Downing, Howard Bressler

10  and Heather Kim from Kasowitz Benson and Torres, LLP.  We also

11  have WSOU's in-house counsel attending this hearing

12  Ms. Sheyanna Pietras, and Mr. Waldrop will be doing the main

13  speaking today, Your Honor.

14      THE COURT:  I think I saw Mr. Zembek as well.  I saw

15  Mr. Waldrop, so I already know it's going to be a good day, but

16  I think I saw Mr. Zembek, which means it'll be a great day.

17      MR. ZEMBEK:  Your Honor, I apologize.  I will not be

18  arguing today.  My partner Adam Schramek will be arguing on

19  behalf of NXP.  It is a great day to see you as well.  And I

20  also have my colleague Eric Green on the line who is visiting

21  from vacation for this particular hearing today.

22      THE COURT:  Well, soon I hope you'll be adding a law

23  clerk -- a former law clerk to some of these calls.  We need to

24  have equity here when we have Mr. Siegmund on to make sure we

25  have a balance of law clerks always, and so...

1      I know you're getting a great one in the near future.

2      MR. ZEMBEK:  We're really excited about it.  Thank you,

3  Your Honor.

4      THE COURT:  And I'm happy to take up the motion.

5      MR. JACKSON:  Good afternoon, Your Honor.  It's John

6  Jackson on behalf of defendant Canon, and we also have Rich

7  Martinelli and Michael Chow and Weimin Ning on behalf of Canon,

8  and it's my understanding we actually have three motions on

9  behalf of defendant Canon, and I believe Mr. Martinelli will be

10 taking the lead on those motions.  And we've agreed with

11 Mr. Zembek and his colleague Mr. Schramek that the NXP motion

12 would be allocated 20 minutes and that Canon's three motions to

13 dismiss would be allocated 40 minutes.

14     THE COURT:  That's absolutely fine with me.  I don't care

15 how y'all do it.

16     MR. JACKSON:  Okay.  Perfect.

17     MR. MARTINELLI:  All right.  So good afternoon, Your

18 Honor.  This is Rich Martinelli.  I'll just take it away.

19     So I'd like to jump into the 982 case which is a little

20 bit more complicated than the other two cases because it has a

21 pretty serious direct infringement pleading issue.

22     If you take a look at the WSOU cases, they started with

23 five cases against Canon before Your Honor, and they've dropped

24 two of them already, so now we're down to three infringement

25 cases.  This 982 case is no better than the two that they've

1    already dropped.

2        For the purpose of this motion, you don't really have to

3    get deep into any of the technical detail of the '537 patent.

4    There's basically just two really fundamental concepts in the

5    '537 patent claims that you need to focus on.  One, they

6    require wavelet compression, and, two, they require

7    transmitting wavelet compressed data wirelessly.

8        To give you a little bit of grounding on what's accused,

9    WSOU has accused Canon's wireless digital x-ray machines, and

10   what those are are devices that in the place of old-fashioned

11   x-ray film, you would have a digital detector.  So if you go

12   into the doctor's office, you've broken your arm, they put the

13   digital detector behind your arm, and that receives the x-rays

14   and sends an image wirelessly to a computer that will have some

15   software on it to accept the image.

16       So the fundamental direct infringement here is these

17   wireless x-ray systems that Canon uses don't do any wavelet

18   compression whatsoever.  So we're completely at a loss as to

19   how WSOU is -- has any Rule 11 basis for coming forward with

20   this claim, any good faith basis for coming forward with this

21   claim.

22       If we look at the FAC, first amended complaint, WSOU now

23   argues that these products infringe because they use a file

24   format called JPEG 2000.  Now, JPEG 2000 is not the regular

25   JPEG that you're used to from your digital cameras.  It's a

6

1   older JPEG format that's actually not used much anymore, and

2   JPEG 2000 is wavelet based.  We'll grant them that much.

3       The problem is Canon's products don't use JPEG 2000 at

4   all.  As I said, that's what they're arguing in the first

5   amended complaint.  This is an entirely new theory.  The

6   original complaint that WSOU asserted had a different theory,

7   which we won't get into for the sake of time, but they've now

8   abandoned that theory.

9       So where's the confusion, right?  Like why does WSOU think

10   they have a case when we clearly think they don't?  So as far

11   as I can understand it, WSOU's entire infringement theory

12   hinges on Canon's support for something called the DICOM

13   standard.  And what DICOM is is basically a standard that lets

14   medical devices from a bunch of different manufacturers

15   interoperate.  And in doing this interoperation, DICOM

16   specifies a bunch of different image formats that can be used,

17   maybe some devices use JPEG 2000, maybe some other devices use

18   uncompressed data.  There's a whole host of them.

19       And the WSOU complaint alleges that because DICOM supports

20   JPEG 2000 and because Canon's accused products support DICOM,

21   Canon's accused products must support JPEG 2000.

22       Now, if they had done a reasonable pre-suit investigation,

23   they would understand that that's not how DICOM works.  And

24   they had to get pretty deep into DICOM because they rely on

25   DICOM itself and these things called DICOM compliance

1    statements in the complaint.

2         The way the DICOM standard works is a little bit like the

3    way that the United Nations has six different languages that

4    can be used to do work for the United Nations.  So if you want

5    to proceed before the United Nations, you can do so in English,

6    you can do so in Russian, you can do so in French, but that

7    doesn't mean that every single person who goes to the United

8    Nations can speak all six languages.

9         So by the same token, just because Canon's products use

10   DICOM doesn't mean that they support every single format in

11   DICOM.  And this is actually readily apparent by not only DICOM

12   itself but the very evidence that WSOU cites in its complaint

13   because DICOM isn't this big monolith where everybody supports

14   every single feature.  There's these things called DICOM

15   compliance statements.  And so for each product there's a

16   statement that says, hey, everybody.  For this product these

17   are the parts of DICOM that I comply with.  And that's Exhibit

18   C to WSOU's amended complaint is the DICOM compliance statement

19   for the accused product.  And if you look in there, it doesn't

20   support JPEG 2000.  If it did support JPEG 2000, it would have

21   had to be in that compliance statement.

22        So we're just at a complete loss as to why they have any

23   basis for alleging infringement here, and if you look at the

24   logic of their infringement allegation, you see that just

25   having DICOM compliance and the fact that DICOM supports JPEG

1   2000 doesn't lead you to believe that Canon's products supports

2   JPEG 2000.

3        So I'd like to turn a little bit to what is WSOU's

4   response to this, right?  What do they reply in opposition?  Do

5   they explain why we're misunderstanding their allegations and

6   why in fact there is some support for the allegation that we

7   use JPEG 2000?  No.  They don't do that.  Instead what they do

8   is they try and brush it all under the rug and say that this

9   case is a Disc Disease sort of issue where we're arguing about

10  the, you know, amount of proof required and, you know, the

11  threshold for a pleading standard and, you know, saying things

12  like we're asking for claim construction or something else.

13  That's not the issue at all.  Right?  Disc Disease sets the

14  minimum threshold of data required to adequately plead, but

15  why?  What is it trying to show?  It's trying to show Your

16  Honor that there's a plausible allegation of infringement.  So

17  it's trying to give you enough information to look at the facts

18  and say, okay.  This logically holds together.  And here it

19  just doesn't.  Right?  There is zero basis for WSOU to assert

20  that Canon's products use JPEG 2000.  If they could provide me

21  any basis, we wouldn't have a complaint here.  They've been

22  unable to do so.  In the reply they fail to do so.

23       So, you know, in WSOU's response here in a few minutes

24  like -- I'd like to know, like, ask them the question, what is

25  their basis for showing that this product uses JPEG 2000 when

1   in fact it does not?  And this has created a bit of a problem.

2       THE COURT:  Why don't I do that?  Why don't I -- why don't

3   we -- we'll jump over to -- I'm not sure who will be arguing

4   for WSOU, but let -- you've, I think, framed the question that

5   needs to be answered and let's hear it.

6       MR. WALDROP:  Good afternoon, Your Honor.  Thank you for

7   this opportunity.  It's always a blessing and a privilege to be

8   able to address the Court on this issue.

9       If I could just first state, Your Honor, in response to

10  this that this sounded like what we think is improper -- most

11  improper is just essentially a summary -- motion for summary

12  judgment when fact discovery has not opened when we have

13  provided detailed claim charts regarding our infringement

14  contentions which are sufficient under this jurisdiction's case

15  law and even under the positions taken by Canon in other cases,

16  Your Honor.

17      This, Your Honor, I think is the most of the three motions

18  that are pending, Your Honor.  This is the one that we find to

19  be the most untimely most premature and the most without merit,

20  given the state of this case and the way the docket is handled

21  here in this jurisdiction, Your Honor.

22      We have a presentation, Your Honor, that we prepared for

23  the Court, and I can take it out of order, Your Honor,

24  regarding the JPEG 2000 issue and the judgment on the

25  pleadings, Your Honor.  But essentially this is a case that

1    should be denied as well, because if you will allow me, Your

2    Honor, I will share my screen and the part of the presentation

3    that we have which addresses this particular issue, Your Honor.

4         THE COURT:  Yes.  Sure.

5         MR. WALDROP:  Thank you, Your Honor.  Can you see it, Your

6    Honor?

7         (Thumbs up by the Court.)

8         THE COURT:  I can.  Yes.

9         MR. WALDROP:  Okay.  Thank you, Your Honor.  Great, Your

10   Honor.  Then I will proceed, Your Honor.

11        Well, Your Honor, on the 982 case, Your Honor, this is

12   Canon's motion for judgment on the pleadings, Your Honor.  As

13   you know, Your Honor, under the 12(c) standard, this is a high

14   standard, Your Honor, and I won't belabor this point on Slide

15   44.  But essentially, Your Honor -- and Slide 45 -- we lay

16   out -- WSOU lays out in great detail, Your Honor, its indirect

17   infringement theory, Your Honor, regarding the '537 patent, and

18   that's in Paragraphs 11 and 12 which are the allegations in the

19   amended complaint which set forth our theory with respect to

20   the direct infringement claim as to the '537 patent claims,

21   Your Honor.

22        On Slide 46, Your Honor, we provide for the Court a

23   snapshot of the detailed claim charts that we presented as to

24   the '537 patent where we lay out, Your Honor, our position as

25   to how the '537 patent is infringed by Canon's digital

1    radiographic systems, Your Honor.  In fact, our charts

2    specifically identify documents that Canon references JPEG 2000

3    standard, Your Honor, and these are public documents that are

4    cited by Canon in their materials which reference the JPEG 2000

5    standard, Your Honor.

6         Now, this is what they are saying, Your Honor.  These are

7    the statements they have made without the benefit of further

8    discovery.  Mr. Martinelli seems to be relying on things that

9    have not been disclosed and positions that have not been

10   disclosed in this case, and we take issue with, Your Honor,

11   based on the inconsistent positions that they've made in their

12   public documents, Your Honor.

13        This is all laid out in the first amended complaint, very

14   fulsomely, very detailed, Your Honor, in terms of what our

15   infringement case is, and these documents reference the JPEG

16   2000 standard.

17        Now, I know Mr. Martinelli has presented what I think is

18   an argument for maybe claim construction on argument for maybe

19   expert discovery which hopefully in due course will come in

20   this case, Your Honor, but in their public documents they

21   reference the JPEG 2000 standard, and we have raised this issue

22   with them without a satisfactory explanation.  And this is in

23   Slide 46.  It's just referencing this detailed claim charts

24   which were provided without --

25        MR. MARTINELLI:  Excuse me, Your Honor.  I have to jump

1   in.  This is still my time.

2         So please tell me which document you're relying on where

3   Canon says it uses JPEG 2000.  You showed --

4         THE COURT:  Counsel, I don't -- we're not having a

5   discussion here between you all.  And so if you would do me the

6   favor of not interrupting opposing counsel, I would appreciate

7   it.

8         MR. MARTINELLI:  I apologize, Your Honor.

9         THE COURT:  That being said --

10        MR. MARTINELLI:  I'm a little bit excited about this.

11        THE COURT:  Well, that being said, to your point, I was

12   hoping counsel for WSOU would address that direct question that

13   was -- what was put to you just then.  That is why I tossed the

14   ball back over you, Mr. Waldrop.  So if you could jump on

15   that -- I understand all the other stuff you're saying about

16   discovery and where we're at in the case and all that, but I

17   think he's put a pretty pointed question to you.

18        MR. WALDROP:  Your Honor, they're in the infringement

19   contentions, Your Honor, identifying support in the claim

20   chart, Your Honor, and I can specifically give you the page,

21   Your Honor, if he wants to continue on in his argument.  I'll

22   give you the particular page, but it's in the detailed claim

23   chart.  It's actually on Page 8 of the claim chart, Your Honor,

24   which is not in front of me now in this slide declaration, but

25   for the Court's record it's on Page 8 of the claim chart.

1        THE COURT:  Okay.

2        MR. WALDROP:  And I'll hand it back over to Mr.

3    Martinelli.  I don't want to take much of his time, Your Honor,

4    but it's on Page 8.

5        MR. MARTINELLI:  Okay.  So the material that Mr. Waldrop

6    just identified is not in the complaint, but I'm happy to

7    address it.  What they've cited --

8        So first and foremost before I go address that, the first

9    amended complaint has zero evidence that Canon's products use

10   JPEG 2000.  The information that Mr. Waldrop is talking about

11   in the infringement contentions is a document that, number one,

12   is not made by -- or a product that's not made by Canon, Inc.,

13   the party in this case, and, number two, is not the product

14   that's accused of infringement in this case.  So what they're

15   pointing to is something called a PACS server.  And so it's

16   another DICOM compliant device.  And there was a Toshiba entity

17   that Canon bought sometime ago that makes these PACS servers

18   and makes them in Japan and does not sell them in the U.S.  So

19   there are no PACS servers from Canon in the U.S., and that

20   different device, that PAC server, does reference JPEG 2000.

21   That has nothing to do with the wireless device that's being

22   accused of infringement.  We've actually provided WSOU a signed

23   declaration to try and help them work through this issue and

24   they still have not been able to articulate how the fact

25   that -- you know, to use my UN analogy, Canon has a cousin back

1    in Japan that can speak Arabic, how that has anything to do

2    with the fact that the accused product here does not do JPEG

3    2000.  If the accused product did do JPEG 2000, it would be in

4    that compliance statement that they attached to Exhibit C on

5    the complaint.

6        So to sum up, the complaint doesn't support any plausible

7    claim for infringement.  The infringement contentions, they're

8    scrambling.  I don't really know why they want to keep this

9    case alive.  I wouldn't be here, Your Honor, telling you that

10   the product doesn't have JPEG 2000 if it had JPEG 2000.  I

11   wouldn't ruin my credibility like that.  So I'm not really sure

12   what they're getting at.

13       While I have a little bit more time, I do want to continue

14   on and talk a little bit about the indirect infringement issues

15   if I may.

16       THE COURT:  You can.  Of course.

17       MR. MARTINELLI:  So the big issue here is that for the --

18   all three cases, Canon had no pre-suit knowledge of the

19   patents-in-suit.  So we understand that it's this Court's

20   regular practice that in that case the indirect infringement

21   claims are dismissed without prejudice for the parties to bring

22   them back in later after discovery shows that they might be

23   admissible.  That's what we're asking for here.  I believe

24   WSOU's position is that the amended complaints or, you know,

25   the amended complaint in the case in the 982 patent (sic) or

1    the original complaint might give a basis for notice.  It's

2    Canon's position that that doesn't provide adequate notice and

3    that you shouldn't be able to create a cause of action for

4    indirect infringement based on the complaint itself because

5    that would completely undermine the notice and the notice

6    provisions of indirect infringement law.

7         If we turn to the actual details of the indirect

8    infringement claims, there's a bunch -- a host of other

9    problems that we have that I think the Court should focus on.

10        First, with respect to this 982 case, how could the

11   original complaint have given us any notice of infringement if

12   they've abandoned that theory and have a completely new theory

13   in the FAC?  And how can the FAC give us any notice if we don't

14   understand what they're saying and it doesn't actually show

15   infringement?  Because we don't use JPEG 2000.

16        Similarly, with respect to the other two cases, there's

17   the 980 case which we're going to be talking about a little bit

18   more with the lawyers from Norton Rose.  That case involves

19   Bluetooth.  The prior owners of these WSOU patents were all

20   members of the Bluetooth SIG and required pre-licenses to all

21   Bluetooth SIG numbers.  The infringement allegations against

22   Canon are that we infringe because we practice Bluetooth, point

23   blank, period, end of story.  So we don't see how that puts us

24   on notice of any infringement.

25        Similarly, with respect to the middle case, the -- we call

1    it Case 2, the 981 case, that case also we have serious

2    problems with the infringement allegations which are mentioned.

3    So we don't see how the complaints put us on notice.  We don't

4    believe we infringe.  There's no evidence of intent to infringe

5    based on the filing of the original complaint in any of these

6    cases.

7            Beyond that, there's also some detailed problems with the

8    actual facts that they're -- that WSOU's relying on to show

9    inducement in the U.S.  The inducement facts that plaintiff

10   relies on are largely related to actions of a nonparty Canon

11   USA.  So Canon operates in the U.S. through Canon USA which is

12   the sole source for the accused products in this case.  Canon

13   does -- Canon, Inc., the party here, does not sell to consumers

14   in the U.S., doesn't talk to consumers here in the U.S.  So all

15   of the evidence that plaintiffs rely on for showing inducement

16   doesn't show inducement by Canon, Inc.

17           Now, WSOU could have sued Canon USA.  There's no reason

18   why they couldn't have sued Canon USA except for the fact that

19   they must like being before Your Honor, and if they sued Canon

20   USA, they'd have to sue in New York.  And that's fine.  That's

21   their tactical decision.  That's okay for them.  But if they're

22   going to make that choice, they have to respect the party that

23   they sued and the fact that it's not Canon USA.

24           So if you look at WSOU's opposition, they say, well, maybe

25   there's a bunch of factual issues about Canon, Inc.'s sort of

1   controlling Canon USA and there's heavy factual issues.  Well,

2   if there were those heavy factual issues, they should have sued

3   Canon USA, and if they intend to raise deep factual issues

4   about Canon USA's activities, I need to know that now because

5   maybe that creates a third party witness issue that counsel's

6   (inaudible) transfer based on convenience reference.

7        Right now what we're dealing with in this complaint is

8   something that fails to show indirect infringement because it's

9   all based on activities of a nonparty, and there's no logical

10  connection in the complaint, no factual pleading in the

11  complaint to say that Canon, Inc. has any inducement activities

12  here in the U.S.

13       With that I'm going to reserve the rest of my time,

14  although it's a little hard to figure out how much I have left.

15       THE COURT:  Mr. Waldrop?

16       I think to summarize the direct infringement concerns that

17  have been raised, basically -- and, you know, Mr. Martinelli

18  can correct me, but it sounds to me like they're saying the

19  product that you're accusing doesn't do -- cannot infringe.  I

20  mean, there's no way it can infringe.  And that it's -- and,

21  you know, tell me what I do.  It doesn't help me for you just

22  to cite me to Page 8 of your infringement contentions when his

23  response is the product that doesn't have the -- what is the

24  allegedly infringing aspect?  What do you suggest I do here?

25       MR. WALDROP:  What I suggest, Your Honor, is that we

1    proceed -- how we proceed in other cases and that motion be

2    denied subject to discovery.

3        But to answer your particular point, Your Honor, to answer

4    his point is, Your Honor, there is no evidence and Canon has

5    not provided us evidence or comfort to show that there is no

6    compatibility for JPEG transfer syntax by the accused

7    functionality with respect to -- that would support the JPEG

8    2000 standard.  And we have not received documentation that

9    indicates that JPEG 2000 related data can flow through the

10   system, including the accused product.  So we don't have any

11   way of knowing or backtracking the origin of a JPEG 2000 data

12   which may flow through the product.  They make the claim, Your

13   Honor, that it is the nonparty which is actually a subsidiary

14   of Canon.  They say that the servers are not made or sold by

15   Canon.  But, nevertheless, Canon understands that these servers

16   are not available in the United States.  As such, the server is

17   completely irrelevant to WSOU's allegations.  What we're

18   discussing is the capability or the compatibility of JPEG 2000

19   data by the servers, and that has not been provided to us with

20   sufficient comfort, and so that still raises an issue of

21   infringement, Your Honor.  And frankly, Your Honor, we feel

22   like we're at a complete disadvantage, given he knows more than

23   we know.  We have not had the ability to test any of his

24   declarations.  We've had multiple conversations with them about

25   this issue.  We've dug in this.  We've dealt with this case in

1    good faith.  As he even indicated that we dropped patents from

2    the case and proceeded with the ones that we believe show

3    infringement sufficient under detailed claim construction

4    charts, Your Honor, and we have no way of knowing whether or

5    not this JPEG 2000 data is compatible with the servers, Your

6    Honor.  And in that sense, Your Honor, we're at a disadvantage,

7    at a loss and at the complete control of Mr. Martinelli and his

8    client in terms of what they want to give us and what they want

9    to say on this call.  And I think that highlights, Your Honor,

10   the inappropriateness of the posture of his arguments, given

11   where we are in the case, given the numerous back and forth.

12   So that's all I can say, Your Honor.

13        If the Court is inclined to take this up right now, which

14   would be different than we've done in other cases, then we

15   think that we should be allowed fulsome discovery on this point

16   and allowed to test which are pretty definitive and broad

17   statements by Mr. Martinelli and his client that we can't test

18   at this point.  So I think the motion should be denied.  And if

19   the Court wants to get to the bottom of this, as we do, we

20   should be allowed fulsome discovery on this and the ability to

21   test this to our satisfaction.  And we have no intent in

22   pushing cases that have no merit.  We think this one does based

23   on our numerous back and forth with Mr. Martinelli and his

24   client.

25        THE COURT:  Anything else, Mr. Martinelli?

1      MR. MARTINELLI:  I don't hear any basis for them to say

2  that we have JPEG 2000.  The logical connection between, you

3  know, is it true that the product they're relying on to say

4  there's JPEG 2000 support is this Toshiba product that has

5  nothing to do with the accused product?  Yes.  Mr. Waldrop

6  didn't deny that.  There's no logical connection.  I think that

7  this case doesn't pass the threshold of stating a claim.  I

8  don't think I've heard anything from Mr. Waldrop to show that

9  it passes that threshold.  If we're going to go further, I want

10  to figure out what's the quickest and easiest way to get to

11  this resolution because this is a waste of everybody's time.

12  Their theory that the product uses JPEG 2000 is completely

13  unfounded and we need some way to resolve this soon.  I don't

14  think they cross the motion to dismiss threshold.  If there's

15  some other way, we'll do it another way.

16      THE COURT:  So let me ask you this, Mr. Waldrop.  I think

17  that's a fair point.  I'm always reluctant, I think most judges

18  are, to dismiss things.  So you -- we're all together here now.

19  Tell me -- and this is unusual in my court, but the offer was

20  made, and I think it's a -- it was a -- one that is well taken.

21  Specifically what is it that you need in terms of discovery

22  from the defendant to know that they have this potential

23  functionality or that they don't?  What is -- and what is the

24  quickest -- I'm happy to do all this on an expedited basis and

25  to take up Mr. Martinelli's suggestion.  So tell me what it is

1    that you would want -- what you would want in discovery from

2    the defendant and we'll get that set on a fast track and we can

3    take this up again as a motion for summary judgment in the near

4    future.  So what would you like to add?

5        MR. WALDROP:  Your Honor, we propose a short deposition

6    and some related documents to resolve this.  They said no.

7    They said Japan.  It would take months to --

8        THE COURT:  Mr. Waldrop, we're past -- you guys I don't

9    think ever learn.  Let me put this -- say it one more time.  I

10   don't care.  I mean, I don't care what you guys discuss.  I'm

11   here now.  I have the unique ability that none of you all do

12   that if I think it's something's well taken, I'm going to

13   suggest that you do it, and so far people have always taken my

14   suggestion to heart and done it.  So all I care about is you

15   have Mr. Martinelli here.  He has told me that no matter what

16   you ask for from him, you will not be able to articulate a case

17   of infringement.  I will tell you that I'm -- I suspect that

18   may be true, but I don't know.  I'm not ready to dismiss the

19   case, but this is your opportunity to tell the defendant what

20   it is you'd like.  I certainly think a short or -- you know, a

21   reasonable 30(b)(6) on this topic would be well taken, but tell

22   opposing counsel what evidence it is you'd like to have in

23   advance of that 30(b)(6).

24       MR. WALDROP:  Your Honor, a short deposition would be

25   great.  Thank you, Your Honor, for that.  And also documents

1   that we requested further supporting or relied upon by their

2   witness in their declaration, Your Honor.  Any technical

3   documents or source code confirming the declaration or

4   confirming their deposition, that's what we would like, Your

5   Honor.  Thank you.

6        THE COURT:  Mr. Martinelli, you know, and I don't, what it

7   is that they asked for.  Is there anything that they asked for

8   that you are unwilling at this time to provide so that we can

9   move this forward?

10        MR. MARTINELLI:  So I don't know that the request was

11   quite detailed enough for me to know, but I'm absolutely

12   willing to be as collaborative as possible to make this happen.

13   I think the only two challenges we have are, number one,

14   proving a negative.  So if I -- you know, how do I show them

15   the thing doesn't have JPEG 2000?  It doesn't.  There's no

16   evidence it has JPEG 2000.  So we'll try and work with them to

17   prove them --

18        THE COURT:  Well, I think this, and you -- everyone on

19   this call, because I know many of you, are a thousand times

20   brighter than I am, but if -- but Mr. Waldrop is now on the

21   clock to articulate to you specifically what he thinks he --

22   he's going to have to tell you, this is what I think you have

23   and give it to me.  One way you prove a negative is that if he

24   says, I want the following six buckets, and you go to your

25   technical people -- and you may already have done it -- and

1   they say, we don't have any of that, then I'm going to take

2   that representation from you as an officer of the Court that

3   there isn't any of that.  And so he will have had his

4   opportunity to ask you for documents.  You will have fulfilled

5   your obligation.  He then gets to take a three- or four-hour

6   30(b)(6) of someone from your shop.  And then at end of that,

7   if he doesn't have any information to support his claim,

8   there's a good chance it won't survive your motion.  So the

9   burden at the moment is on Mr. Waldrop to articulate for you --

10  and he needs to do it -- Mr. Waldrop, I apologize.  I'm talking

11  about you like you're in the third person, but I can assure you

12  that you're sitting -- your handsome visage is sitting right in

13  front of me here, but I'm -- the burden right now is on you to

14  tell Mr. Martinelli, I want exactly this to prove my

15  infringement claim.  And Mr. Martinelli, who I don't think I've

16  met before, but I know from anyone who works with Mr. Zembek

17  has an immediate five star representation.  And so if he tells

18  me that he doesn't have any of those documents and after the

19  deposition you don't have any more to go with than this, then

20  this claim will probably be short lived.

21       MR. MARTINELLI:  Thank you, Your Honor.

22       THE COURT:  Anything else on that particular -- on this

23  particular issue?

24       MR. WALDROP:  No, Your Honor.  Thank you.

25       THE COURT:  Okay.  Then let's move on to whatever the next

24

1    issue is.

2         MR. ZEMBEK:  Your Honor, this is Richard Zembek.  I think

3    the next issue will be NXP's motion to dismiss Canon's third

4    party claim against it.  Mr. Schramek will be addressing that

5    on behalf of NXP.

6         MR. SCHRAMEK:  Your Honor, we do have a very short

7    PowerPoint we'd like to use during argument if that's okay with

8    you.

9         THE COURT:  That's absolutely fine with me.  You won't be

10   the first.

11        (Laughter.)

12        MR. SCHRAMEK:  All right.  Your Honor, I'd like to start

13   by explaining the relationship of the parties.  We're here

14   today on NXP's motion to dismiss Canon's third party complaint

15   that essentially asserts a single breach of contract claim for

16   breach of indemnification agreement.  NXP acquired Marvell's

17   WiFi Bluetooth business in 2019.  And there's a chip that has

18   been going to Canon through distributors both before the

19   acquisition and after the acquisition.  As part of that

20   transaction, NXP did undertake those obligations with respect

21   to its sales going forward.

22        Now, that obligation has two parts, these indemnification

23   agreements.  The first agreement talks about both defending and

24   indemnifying Canon from claims alleging that the use of the

25   chips and any associated firmware infringes a third-party

1   patent.

2      The second indemnification is limited to indemnification,

3   there is no defense obligation, and it says that Canon will be

4   indemnified for claims alleging infringement of functionality,

5   adopted a standard from Bluetooth of any Marvell products that

6   are sold to Canon.  And of course this was an agreement to take

7   on that obligation going forward, so when we refer to Marvell,

8   we're talking about NXP chips going forward since 2019.

9      So those are the two indemnification clauses that are at

10  issue here.  They are stated in Paragraphs 13 and 14 of Canon's

11  third party complaint, and those are the clauses that we've

12  moved basically to dismiss their claim for because Canon has

13  not stated a claim under Rule 12(b)(6).

14     If you look at WSOU's claims against Canon, these are the

15  infringement claims.  If you've ever seen insurance coverage

16  work, Your Honor, you start with, what does the lawsuit say?

17  What does the insurance agreement say?  They'll defend.  And

18  let's look at the eight corners of those documents and see

19  whether or not we have a covered claim or not.  Is there a

20  defense obligation or not?

21     If you look at WSOU's claims in this amended complaint,

22  Paragraph 12, what they've asserted is that there's an

23  infringement not just of one camera.  They do give an example

24  product.  That example product does use an NXP chip that in

25  theory could be enabled for a Bluetooth 5, but they assert it

26

1   also covers numerous other devices that infringe the patent

2   that have been made, used, sold, imported, et cetera, by Canon

3   over the years.

4       Now, you don't have to just look at their amended

5   complaint to know the breadth and scope of their claim because

6   if you look at their preliminary infringement contentions,

7   which we did file as Exhibit 1 to our reply brief, they make it

8   extremely clear that they're looking at products past, current

9   and future that are Canon products that operate in the same or

10  substantially similar manner as that one identified camera as

11  the exemplar infringing product and that they're looking at all

12  past, current and future Canon products that have the same or

13  substantially similar features.  So it's a very broad net

14  they've cast that essentially goes to Canon's Bluetooth product

15  line.  It's not one camera.  The claim has to do with the

16  functionality and Bluetooth compatibility and enabling uses of

17  the entire product line.

18      So let's look at Canon's indemnification claim that they

19  filed against NXP and only NXP, as the Court's record will

20  show.  They've asserted a single cause of action and they seek

21  a judgment against NXP that it's liable to Canon to indemnify,

22  defend and hold harmless all claims of WSOU arising from

23  infringement of the '346 patent.  So it doesn't matter who

24  made it, doesn't matter who provided the chips.  Under their

25  own pleadings in their claim, they said, it's all your

1    liability, NXP.

2        They then want all money they've had to spend in this

3    action, including attorneys' fees, costs, et cetera, and

4    damages and royalties to the extent they're ultimately liable

5    on royalties.

6        Now, if we stop right there and we looked at what did that

7    indemnity clause say, those two indemnity clauses, versus what

8    is WSOU's claim they've asserted in this Court, they're night

9    and day.  One of them is very limited to NXP chips, NXP

10   firmware.  And when we get to Bluetooth, it's only Bluetooth of

11   any NXP products sold to Canon, and, again, that's limited to

12   indemnification at the end of the day, not a duty to defend a

13   lawsuit.

14       So if we compare that to WSOU's infringement claims, we're

15   talking about a lawsuit against Canon for their entire

16   Bluetooth product line versus one chip that went into one

17   camera that they're trying to argue NXP should have -- be on

18   the hook for everything, for their entire product line.

19       Let's start with the indemnity claim because I think

20   that's the easiest one.  In their response they essentially

21   concede that their claim is premature or, as they say, maybe

22   it's overbroad.  Well, they have to concede that because these

23   indemnity agreements are subject to California law, and of

24   course in deciding the motion to dismiss the Court will look to

25   California law, and there's a specific provision in the

1   California code on how to interpret indemnity agreements, and

2   it says you can't be liable until the indemnified party

3   actually pays.  They have to pay for it and they have to become

4   liable for it.  And if you look at the case law, that means a

5   final nonappealable judgment that's been paid.  And of course

6   that makes sense, because until we have a final appealable --

7   nonappealable judgment that's gone through discovery, that's

8   gone through the claim construction on all the arguments and

9   all the experts, we don't know at the end of the day which of

10  these products in the product line are ultimately going to be

11  held to infringe.  So the indemnification claim should be dead

12  on arrival, and that's exactly what the California Supreme

13  Court explained all the way back to 1970.  It says you actually

14  have to incur loss, incur liability and pay it before we start

15  litigating indemnity.  So it's a premature claim on the

16  indemnity side.

17       On the defense side WSOU agrees -- I'm sorry -- Canon

18  agrees in its motion to dismiss that this claim is all about

19  Bluetooth 5 compatibility, Bluetooth 5 enabled products, and

20  their entire defense is, look, we're licensed.  We get to use

21  Bluetooth 5 enabled products.  We get to buy chips from NXP,

22  Samsung, whatever supplier we want because we hold the license.

23  That's a product line defense they're putting up at the same

24  time they're trying to hold the one supplier liable for the

25  entire liability.

1       So if you looked -- and by the way, I want to say here,

2   Your Honor, even though we didn't participate in the briefing,

3   NXP completely agrees with Canon's motion to dismiss, that it

4   has been licensed for this functionality.  It's provided that

5   license to the Court.  And WSOU really has no explanation as to

6   why they're not bound by that license when they took the

7   patents subject to that license.  They acquired it after

8   Alcatel was part of the SIG that had this Bluetooth convention

9   and got a royalty free license.

10      So we can certainly agree that the entire Bluetooth claim

11  should be dismissed.  It's not a proper claim.  It's not even,

12  you know -- does not meet the standard for a 12(b)(6).

13      But at the same time we're not the ones to defend it.

14      And I want to point the Court to a California Supreme

15  Court case in 2008.  And what they said -- as you may have

16  noticed, I started by talking about insurance.  I do a lot of

17  insurance class action work.  I started talking about

18  insurance, and, you know, you look at the coverage and you look

19  at the claim, but what the California Supreme Court said is,

20  but hold on.  An indemnity -- commercial indemnity is not the

21  same as an insurance contract because in an insurance contract

22  we broadly construe coverage in favor of the policy holder.

23  But when we're talking about a commercial indemnity, we

24  narrowly tailor those, and the reason is because it's the

25  indemnitee -- and indemnitee with an EE at the end here --

1    Canon, who may often have the superior bargaining power.  So,

2    you know, there's a supplier trying to get a business trying to

3    get a bid and they put an unfair, you know, provision into the

4    contract, a really overly broad indemnification provision, and

5    the courts say, we're going to take that into account, and if

6    there's any ambiguity, we're going to narrowly interpret those

7    agreements.

8         And, Your Honor, that's what we would argue is exactly

9    what is happening here, because if you compare that scope of

10   indemnity we've been talking about, that explains exactly why

11   Canon's claims fail and should be dismissed here at the

12   pleading stage.  There is no indemnification claim for any WSOU

13   damages, and so liability and payment of a final judgment that

14   I'm sure if there was a final judgment against Canon they'd be

15   appealing, and we're many years down the road from here.

16   There's no claim to state today.  We don't know what products

17   would be ultimately infringed, what the damages would look

18   like, how you would allocate those.  It's all premature.

19        There's no specific claim by WSOU that it's NXP's chips or

20   NXP's firmware that infringes.  So we're not even in that first

21   indemnification.  We're really down to the second that doesn't

22   even have a duty to defend on it, and there's no obligation to

23   defend Canon's entire product line.

24        And, finally, if you look at their complaint, you know,

25   we're talking about the world of indemnification, there's no

1   allegation that they've actually paid anything and no proof to

2   explain how those payments were for NXP chips versus the rest

3   of their product line.

4        The allegations are insufficient.  The claims are

5   premature.  And, Your Honor, we would ask this Court to dismiss

6   the third party complaint, and we also support dismissal of the

7   Bluetooth claims that WSOU has alleged as infringing because

8   they are clearly licensed for that functionality.  Thank you.

9        THE COURT:  Response?

10       MR. MARTINELLI:  Okay, Your Honor.  So at the risk of

11   losing Mr. Zembek's endorsement here, I'm going to have to say

12   that I just really don't get where NXP is coming from here.

13       So to be clear, there is only one Bluetooth 5 chip that

14   has been accused of infringing in this case, and that's NXP's

15   chip.  So as a fundamental matter, NXP has a duty to defend its

16   infringement allegations against its chip, and WSOU is

17   unequivocally asserting that Canon's product incorporating that

18   chip infringes.

19       We show in the complaint all of the elements of a contract

20   claim, and what I'm hearing here from counsel is maybe they

21   have some defenses to that, but I don't think that says that

22   they -- that we fail to state a claim.  They unequivocally have

23   a duty to defend.  Counsel's argument about the two -- the

24   scope of the two indemnities and two different indemnity

25   agreements is pretty detailed contract interpretation that I

1    don't believe appeared in their original brief or in their

2    reply.  So I think there's a lot of arguments that could be

3    brought to bear to rebut that.  For example, I don't think

4    there's two separate indemnity agreements.  I think there's one

5    indemnity agreement which was then further amended to add some

6    additional requirements by NXP.

7        So I don't see anywhere in the agreement where they only

8    agreed to defend against claims against their chip if their

9    chip is the only chip in the case.

10       Let's imagine as a hypothetical that there were two

11   products at issue.  There aren't, but let's imagine there were.

12   One was an NXP product and the other was another third party

13   chip maker.  We'd expect both of those parties to come in and

14   defend their chips.  That's what they agreed to in their

15   indemnity claim.

16       With respect to the scope of the indemnity and the

17   California statute that NXP is relying on, as we state in our

18   brief, we think that they fundamentally just have it wrong.

19   There's two -- it's a somewhat complicated statute.  It's a

20   somewhat complicated statute that isn't meant to overrule the

21   express intent of the parties, but Clause 1 of that statute,

22   and we cite a case California Plaza Associates in our

23   opposition brief to show this, says that if there's a duty to

24   defend, that happens immediately.  You don't have to wait until

25   there's an actual ruling of infringement and liability.  That

1    duty to defend to mean anything has to attach immediately, and

2    that's what Canon is asking for.  We don't understand how we

3    could have pled with any more particularity unless NXP is

4    asking for just, you know, some superficial magic words that we

5    had to say.

6         We don't understand how NXP can say that they don't have

7    to defend against their chip other than detailed factual

8    argument they might have about the scope of the contracts or

9    the particular allegations.  The bottom line is Canon doesn't

10   make Bluetooth chips, NXP does, and we bought them from them,

11   and NXP agreed to cover any infringement that occurred and to

12   defend us if somebody accused those Bluetooth chips of

13   infringing, and that's all we're asking for.  If another chip

14   comes in, there may be an apportionment or some other issue,

15   but right now we're not aware of any.

16        THE COURT:  A response?

17        MR. SCHRAMEK:  Sure, Your Honor.  It's disingenuous to say

18   there's only one chip at issue when, you know, prior to this

19   hearing we sent them a link to another product that uses from

20   another manufacturer Bluetooth 5.0, and the response was, well,

21   that's an affiliate.  That wasn't this specific entity.  And

22   there were other things that we pointed to on their website and

23   references to where they have a Bluetooth functionality and the

24   fact that, it's even unclear after the response allegations,

25   that this is only limited to Bluetooth 5 or whether or not, you

1    know, it's -- includes predecessor products.  So the idea that,

2    you know, NXP is the only chip on the market for them is

3    just -- we don't believe it's true, Judge, but that's certainly

4    outside the record.  What's in the record here is very clearly

5    that Mr. Martinelli is trying to transition this representative

6    product to the only product.

7         And if you look at a record and you look at the scope of

8    those indemnifications, the one that he's focused on which is

9    talking about the Bluetooth, it's limited to an NXP chip and

10   it's limited to indemnification.  It doesn't say duty to defend

11   anywhere.

12        And even if you look at the very first one, the defense

13   obligation is limited to a specific NXP chip.  And that is not

14   what this case is about.  That's not what WSOU has alleged, and

15   the idea that a manufacturer can pick one supplier and then go

16   assert the claim that it wants to against that supplier and

17   then act like nothing else is implicated is just not what the

18   law says here.

19        And we don't disagree, decide the duty to defend at the

20   outset.  In fact, Your Honor's probably very familiar with the

21   Texas Supreme Court opinions where they talk about the duty to

22   defend you can decide by a declaratory judgment, but, one, I

23   want to point out an important fact here which is you never do

24   it in the same proceeding.  The same jury that's deciding

25   liability doesn't decide coverage, doesn't decide

1   indemnification because you don't have the facts yet.  You need

2   to make that decision.  And here we believe with respect to the

3   issue of -- that has been pled, the claim that has been pled

4   does not state a claim against NXP.  For the same reasons we've

5   talked about the breadth of WSOU's relief they're seeking and

6   the idea that we would have to step in and defend that claim,

7   completely inappropriate.  And if you look at that California

8   Supreme Court, this is exactly what it said, that when you have

9   a commercial indemnity, you have to be careful and narrowly

10  construe it because you don't want that party to try to flip

11  the liability when that's not what the contract said.  We never

12  said we'd take on their entire line of Bluetooth products and

13  defend them against all claims to a patent.  We said a single

14  chip, and that is not what this case is about.

15          THE COURT:  Anything else?

16          MR. MARTINELLI:  Yeah.  What NXP is not doing is what

17  counsel just said they agreed to do is defending the allegation

18  against its chip which is the only specific product in this

19  case.  The other products that counsel mentioned are not

20  Bluetooth 5.  There is no other specific product that WSOU has

21  identified.  There is one product in this case, and it's an NXP

22  chip, and NXP has refused to step forward and indemnify.  We

23  think that creates a cause of action and we should go forward

24  on that claim, Your Honor.

25          THE COURT:  Anything else?

1      MR. ZEMBEK:  Your Honor, this is Rich Zembek.

2      One thought that I do have in listening to the argument on

3  this today, I know that the Court is familiar with the

4  Bluetooth standard, the Bluetooth SIG and the royalty free

5  license that goes with it.  When we look at the infringement

6  contentions, we see nothing to the Bluetooth standard and no

7  other functionality in those particular contentions, and --

8      THE COURT:  Mr. Zembek, if I were to tell you before you

9  started talking I was going to rule in your favor, would you

10 want to keep going, or did -- would you want to make this

11 argument?

12     MR. ZEMBEK:  I would probably stop, but Mr. Martinelli

13 would probably want to make this argument.

14     THE COURT:  Okay.  So I'm going to deny the motion.

15     What is the next motion before the Court?

16     MR. MARTINELLI:  Excuse me, Your Honor.  You're going to

17 deny which motion?

18     THE COURT:  My understanding -- I'm denying NXP's motion.

19     MR. MARTINELLI:  Okay.  Thank you, Your Honor.  I think

20 that's it for today then.

21     THE COURT:  That's it?

22     MR. WALDROP:  There was one issue, Your Honor, if I may,

23 Your Honor --

24     THE COURT:  Sure.  Of course.

25     MR. WALDROP:  -- for clarification on.

1      Just on Canon's motion to dismiss our indirect

2  infringement claims, Your Honor.

3      THE COURT:  Oh, I'm sorry.  Thank you for reminding me.

4  So here -- I don't know why I would handle this any differently

5  than I handle it in every other case, and I'm about to get a

6  standing order out on this, I think, which is when a defendant

7  moves to dismiss claims of indirect infringement absent your

8  ability -- I'll make this up -- to say, actually, Judge, you

9  know, we talked.  You know, we had one of those negotiations

10  you have between parties where you talk about patents and

11  licensing and all that.  Absent some kind of easy evidence that

12  shows there might be a date earlier than the date of the filing

13  of the lawsuit, I dismiss the claims without prejudice.

14  Whenever your Markman hearing is set, you'll have three months

15  post Markman to get discovery done.  You can take discovery on

16  any -- from -- you can take discovery from Canon to help

17  establish your indirect infringement claim.  They can't say,

18  well, it's not in the pleading, so you don't get to ask about

19  it.  You do get to ask about it.

20      You have three months to amend your pleadings and add back

21  in your indirect infringement claims.  You don't need to ask

22  for permission from Canon.  I'm agreeing that you have that

23  now.  But I didn't hear anything in the arguments back and

24  forth why I would change my method of doing that today unless I

25  missed something.

38

1      MR. WALDROP:  Your Honor, just one quick question, Your

2  Honor, regarding --

3      THE COURT:  Sure.

4      MR. WALDROP:  This relates to pre-suit infringement only

5  or post-suit infringement regarding indirect infringement

6  claims?  I know --

7      THE COURT:  Both.

8      MR. WALDROP:  Both.  So it relates to both.

9      THE COURT:  I don't -- the juice is not worth the squeeze

10  of me fighting over this issue right now.  You will have an

11  opportunity to amend your pleadings and get set in concrete by

12  three months after the Markman.  You'll have had an opportunity

13  to take discovery on this, which I don't permit prior to the

14  Markman.  So you'll have your opportunity if you decide to add

15  them -- the claims back in, you can do that by simply amending

16  your pleading.  You have permission to do that, at which time

17  Canon can file a motion for summary judgment on that issue if

18  they believe that's appropriate.

19      Is that clear enough for everyone?

20      MR. WALDROP:  Yes, Your Honor.  Yes, Your Honor.  Yes,

21  Your Honor.  I would only note, Your Honor, that this is a new

22  practice.  We would only just point that we saw recently in the

23  USC IP Partnership versus Facebook case where the Court denied

24  a motion to dismiss post-suit indirect infringement claims, is

25  the Court going away from that?

1        THE COURT:  Yeah.  No.  For clarification I think that's a

2   good thing to raise.  Yeah.  I'm finding that if I don't do

3   this now, then I'm going to have to deal with it possibly after

4   the jury comes back, what evidence was there really of indirect

5   infringement afterwards or willfulness -- especially

6   willfulness.  And so I want to give plaintiff every opportunity

7   to articulate -- after getting discovery to articulate as

8   clearly as possible for the Court and give sufficient

9   information to the defendant that they've -- it's fair to them

10  and they can defend against whatever claims you make in your

11  complaint, and then -- I'm learning on the job, as you might

12  imagine, and recently in a couple of cases where I've had to

13  address the issue of willful infringement, I'm trying to tinker

14  with some things there as well.

15       So, you know, it's all -- things will continue to be

16  modified as I get better at doing this job.  And I have a long

17  way to go to get better at this job.  Lots of things to do.

18       So is there anything else we need to take up?

19       MR. WALDROP:  No, Your Honor.  Thank you for the

20  clarification, Your Honor.  Thank you very much.

21       THE COURT:  You're very welcome.

22       Anything else from Canon or from NXP?

23       MR. MARTINELLI:  Nothing from Canon, Your Honor.

24       THE COURT:  Thank you.  Y'all have a good day.  Take care.

25       (Hearing adjourned at 1:57 p.m.)

1  UNITED STATES DISTRICT COURT )

2  WESTERN DISTRICT OF TEXAS    )

3

4       I, Kristie M. Davis, Official Court Reporter for the

5  United States District Court, Western District of Texas, do

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8       I certify that the transcript fees and format comply with

9  those prescribed by the Court and Judicial Conference of the

10 United States.

11      Certified to by me this 17th day of August 2021.

12

13                              _/s/ Kristie M. Davis_
                                KRISTIE M. DAVIS
                                Official Court Reporter
14                              800 Franklin Avenue
                                Waco, Texas 76701
15                              (254) 340-6114
                                kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25